UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

_____

In re:

AHLAN INDUSTRIES, INC., et al.,                          Case No. BG 18-04650
                                                         Chapter 7
          Debtors.

_____/

**OPINION REGARDING MOTION FOR PROTECTIVE ORDER,
MOTION TO ENFORCE ASSET PURCHASE AGREEMENT,
AND
MOTION TO SET ASIDE SALE**

Appearances:

April A. Hulst, Grand Rapids, Michigan, attorney for Anthony Winters and Jamie
          Zichterman.

Joseph M. Infante and Brittni W. Riley, Grand Rapids, Michigan, attorneys for Grand
          Rapids E-Cigarette, LLC.


I.        INTRODUCTION AND JURISDICTION.

This contested matter is before the court on three related motions,[1] all of which

arise from a sale of the assets of several chapter 7 debtors – Ahlan Industries, Inc., Mitten

Vapors, LLC, Peninsula Vapors, LLC, and GR E Liquid, LLC (collectively, the "Corporate

Debtors") – to purchaser Grand Rapids E-Cigarette ("GRE").  Prior to the filing of the

chapter 7 cases, GRE sued the Corporate Debtors and the individuals who owned and

managed the Corporate Debtors, Jamie Zichterman and Anthony Winters (the

"Individuals"), in Kent County Circuit Court.  GRE obtained a partial judgment for civil

---

[1]       The three motions are:  Grand Rapids E-Cigarette's Motion to Enforce the Asset Purchase
Agreement (Dkt. No. 79) and the Motion for a Protective Order (Dkt. No. 75, corrected at Dkt. No.
106) and Motion to Set Aside Order Granting Trustee's Motion for Sale of Real and Personal
Property (Dkt. No. 96) filed by Jamie Zichterman and Anthony Winters.

contempt for over $283,000 against the Corporate Debtors and the Individuals and was in the process of seeking an additional award of attorney's fees and costs when the Corporate Debtors and the Individuals filed their bankruptcy petitions.

After the Corporate Debtors filed their bankruptcy cases, this court approved a sale of their assets to GRE.  GRE asserts that this sale included approximately 60,000 email messages sent and received through email addresses on the corporate entities' G-Suite account.  Winters and Zichterman allege that among these thousands of messages are several hundred email communications with their attorneys – many of which contain legal advice about the prior state court litigation with GRE.  They assert that these messages were not "assets" of the Corporate Debtors and therefore, were not sold to GRE. Alternatively, the Individuals argue that they had a reasonable expectation that the contents of the emails would remain private, notwithstanding the fact that they were sent from corporate email accounts.  They further assert that the emails are subject to claims of attorney-client privilege and should be protected from disclosure to GRE on that basis. The emails are of particular importance to all of the parties because GRE has filed adversary proceedings against both Winters and Zichterman, seeking a determination that the debt owed under the state court contempt judgment is nondischargeable in their respective chapter 13 cases.

The court gave a partial bench opinion on March 11, 2020, in which it made preliminary findings on the waiver and confidentiality arguments raised by GRE.  Based on its preliminary conclusions that the communications were made in confidence and that any privilege which may attach was not waived, the court ordered the Individuals to submit

2

the email communications for an *in camera* review.  The court has reviewed the email communications and has determined to issue this written opinion and a final order.

The court has jurisdiction over these chapter 7 bankruptcy cases.  28 U.S.C. § 1334.  The cases, and all related proceedings and contested matters, have been referred to this bankruptcy court for determination.  28 U.S.C. § 157(a); LGenR 3.1(a) (W.D. Mich.).  The matter before the court is a core proceeding and this court has authority to enter a final order.  28 U.S.C. § 157(b)(2)(A) (matters concerning administration of the estate) and (N) (orders approving the sale of property).  To the extent this contested matter requires the interpretation of the prior sale order and asset purchase agreement, it is well-established that this court has "jurisdiction to interpret and enforce its own prior order[]."  *Travelers Indemnity Co. v. Bailey*, 557 U.S. 137, 151, 129 S. Ct. 2195 (2009); *Lefkowitz v. Michigan Trucking, LLC (In re Gainey Corp.)*, 447 B.R. 807, 814 (Bankr. W.D. Mich. 2011) (bankruptcy court had post-confirmation jurisdiction to interpret prior confirmation and sale orders and related asset purchase agreement), *aff'd*, 481 B.R. 264 (6th Cir. B.A.P. 2012).


## II.   FINDINGS OF FACT.

At the evidentiary hearing on this contested matter, the court heard testimony from two witnesses:  Jamie Zichterman and Anthony Winters.[2]  Both witnesses testified credibly.  The court also admitted six exhibits into evidence, all by stipulation of the

---

[2]   This testimony is reflected in the Transcript of Evidentiary Hearing held on January 8, 2020, Dkt. No. 155, and is cited herein as "Tr. at __."

parties.    The following findings of fact are based on the evidence presented at the evidentiary hearing.[3]

A.    *Prepetition Operation of the Debtor Entities*.

The email communications at issue in this contested matter occurred while the Individuals were operating Mitten Vapors, LLC.  Mitten Vapors was a manufacturer of e-liquid products.[4]  It also sold such products online and, for some period of time, at a retail "vape shop" located on Plainfield Avenue in Grand Rapids, Michigan.[5]  Jamie Zichterman was the owner of Mitten Vapors and Anthony Winters served as its manager.  (Tr. at 22, 61.)

Mitten Vapors utilized G-Suite, a Google product, for email and related services. There were ten different email addresses associated with the Mitten Vapors G-Suite account.  The emails at issue in this contested matter were sent and received from the Mitten Vapors G-Suite email addresses assigned to the Individuals: jamie@mittenvapors.com and anthony@mittenvapors.com.

At the evidentiary hearing, both Zichterman and Winters testified that they used their Mitten Vapors email accounts for business, as well as personal, communications. (Tr. at 24, 63.)  The personal emails sent and received through the accounts included

---

[3]    Certain background facts, including the procedural history of the state court litigation, are gleaned from other documents that are part of the record before the court in these related bankruptcy cases.  Those facts are provided for context only.

[4]    *See* Trustee's Ex Parte Motion for Authority to Operate, Case No. 18-04651, Dkt. No. 13, ¶ 3.

[5]    *Id.*; *see also* Kent County Circuit Court Findings of Fact, Conclusions of Law, and Verdict, Case No. 16-02496-CKB, dated August 6, 2018, attached to Amended Complaints in Adversary Proceeding Nos. 19-80017 and 19-80018, AP Dkt. Nos. 11, as Plaintiff's Exh. A.  The amended adversary complaints against the Individuals are referred to herein as the "Individual Adversary Complaints." The state court opinion is referred to herein as the "State Court Contempt Opinion."

communications with their attorneys, communications with medical professionals, personal banking information, and online shopping orders. (Tr. at 24, 63.) Both accounts were password protected, and Zichterman and Winters each testified that they had never shared their email passwords with any other party. (Tr. at 24, 62.)

The Mitten Vapors Employee Handbook was admitted into evidence at the hearing. (Individuals' Exh. 3.) Winters testified that he had created the Handbook by searching for "employee handbook things" on the internet, and then cutting and pasting provisions he found into a new document for Mitten Vapors. (Tr. at 62.) Zichterman testified that he was not aware of the Handbook during the time he was operating Mitten Vapors and only learned of its existence in the week prior to the evidentiary hearing. (Tr. at 23.) He stated that he did not know if other employees had received copies of the Handbook. (Tr. at 35.) Winters testified that some employees had received it, but he was not sure how many. (Tr. at 69.)

Regardless of who received the Handbook, it is undisputed that the document is silent about email accounts and email communications. The Handbook does, however, address certain employee practices and employer rights, such as cell phone use and workplace inspections. In a section entitled "Cell Phone Use," the Handbook provides: "Employees who receive Company cell phones should strive to use them for Company business only. All phones must be shut off during meetings." (Individuals' Exh. 3.) Zichterman testified that Mitten Vapors did not provide cell phones to employees, although both Zichterman and Winters acknowledged that Ahlan Industries may have paid their cell phone bills on occasion. (Tr. at 36, 71.) Even if company cell phones had been provided to employees, the Handbook does not prohibit personal usage.

5

The section of the Handbook entitled "Workplace Inspections" reserves the company's right to inspect various property, including "computers and other equipment," at "any time, with or without notice." (Individuals' Exh. 3.) The policy goes on to state that such inspections are "compulsory" and that those who "resist inspection may be denied access to Company premises." (*Id.*) Winters testified that Mitten Vapors never conducted such inspections. (Tr. at 82.)

B. *State Court Litigation with GRE*.

GRE filed its state court lawsuit against Mitten Vapors and GR E-Liquid in March of 2016. (State Court Contempt Opinion at 4.) The state court litigation generally arose out of a license and joint purchasing agreement between GRE and GR E-Liquid, which was owned by Winters. (*Id.* at 3.) GRE alleged that GR E-Liquid violated the terms of the agreement, including its "stringent noncompetition requirements," and ultimately terminated the contractual relationship in February 2015. (*Id.*) Approximately ten days later, Zichterman formed Mitten Vapors. (*Id.* at 4.) Mitten Vapors had the same business address as the GR E-Liquid store, employed Winters to work at the store, and inherited the GR E-Liquid inventory and customers. (*Id.*) In June 2016, the Kent County Circuit Court entered an injunction prohibiting certain actions by GR E-Liquid, Mitten Vapors, Winters, and Zichterman that the court determined would violate the noncompete provisions with GRE. (*Id.*)

The Individuals were not originally named as defendants in the state court lawsuit. (Tr. at 51-52.) Zichterman testified, however, that both he and Winters were brought in as parties to the lawsuit a couple of months after it was filed. (Tr. at 30, 52.) Zichterman also stated that he assumed from the beginning of the state court litigation that he would

6

be "included in the lawsuit" at some point. (Tr. at 52.) He explained that this assumption was based on conversations with his attorneys, or with GRE and its counsel. (Tr. at 52.)

Throughout the state court litigation, the Individuals corresponded with various attorneys seeking legal representation and advice both for themselves and for the corporate entities. Prior to the filing of the state court complaint, Zichterman consulted with Attorney Bobbi Hines on "personal and business matters." (Tr. at 33.) Shortly after the state court litigation was filed in 2016, the law firm of Dickinson Wright was retained to represent the Individuals, Mitten Vapors, Peninsula Vapors, and Ahlan Industries. (Tr. at 28-29.) In late 2016 or early 2017, the Individuals and corporate entities switched law firms and retained Varnum Law. (Tr. at 29.) Zichterman testified that both law firms billed all of the represented entities jointly, by sending one invoice directly to him. (Tr. at 31.) He explained that he would sometimes pay the bills personally; other times, he would pay the attorneys' fees out of the Ahlan Industries bank account. (Tr. at 32.)

The state court rendered its opinion finding the Individuals and the Corporate Debtors in contempt of its prior injunction on August 6, 2018. (State Court Contempt Opinion at 18.) It entered a partial judgment, in the amount of $283,064.41, against the Individuals, GR E-Liquid, Mitten Vapors, Peninsula Vapors, and Ahlan, jointly and severally, on September 20, 2018. (Individual Adversary Complaints at ¶ 7.) The judgment reserved the amount of attorney's fees and costs for determination a later date. (*Id.*)

After entry of the state court judgment, Zichterman consulted with an attorney from Warner Norcross & Judd about a potential appeal. (Tr. at 32.) He also consulted attorney Rose Coonen about options for filing "an individual bankruptcy case." (Tr. at 32.)

7

C. *The Bankruptcy Filings*.

Ahlan Industries, Mitten Vapors, Peninsula Vapors, and GR E-Liquid each filed voluntary chapter 7 petitions on November 5, 2018.  Thomas Bruinsma was appointed as the chapter 7 trustee in the Ahlan case and Lisa Gocha was appointed as the trustee in the Mitten Vapors case.  The cases of the chapter 7 Corporate Debtors were consolidated for administrative purposes only by orders entered on December 21, 2018.  (*See* Ahlan Industries, Case No. 18-04650, Dkt. No. 35.)  Pursuant to the orders, all subsequent pleadings have been filed in the Ahlan base case.[6]

Winters and Zichterman also filed individual chapter 13 cases on November 5, 2018.  (*See* Case Nos. 18-04655 and 18-04656.)  GRE has filed, and is currently pursuing, adversary proceedings against Winters and Zichterman seeking to have the debt it is owed under the state court contempt judgment declared nondischargeable in the Individuals' bankruptcy cases.  (*See* AP Nos. 19-80017 & 19-80018.)

D. *The APA and Sale Order*.

On April 9, 2019, Trustees Bruinsma and Gocha filed a Motion for Sale of Real and Personal Property Free and Clear of Liens Pursuant to 11 U.S.C. § 363.  (Dkt. No. 63.)  The Sale Motion sought approval of a sale of the assets of Ahlan Industries and Mitten Vapors to GRE for a total of $25,000.[7]  Attached to the Sale Motion is an Asset

---

[6]     Accordingly, unless otherwise noted, all subsequent citations in this opinion are to the docket in the Ahlan Industries base case, Case No. 18-04650.

[7]     The Sale Motion clarifies that all of the personal property owned by the Corporate Debtors, other than cash and accounts, was scheduled in the Mitten Vapors case and a small amount of cash and intangibles were scheduled in the Ahlan case.  The motion states that there were no assets scheduled in the Peninsula Vapors and GR E Liquid cases but provides that the motion is without prejudice to the rights of the chapter 7 trustees in those cases to make a claim to the sale proceeds.  (Dkt. No. 63 at ¶ 6.)

Purchase Agreement (the "APA"), which specifically identifies the assets that are subject to the sale.  Paragraph (1) of the APA states that the agreement pertains to "all of the assets of the Bankruptcy Estates," including, but not limited to:

> *(a) all assets listed on Exhibit A*;
> **. . . .**
>
> (e) *all general intangibles as defined in the UCC*;
> . . . .
>
> (h) *all records and lists that pertain directly or indirectly, in whole or in part, to the Seller's customers, suppliers, advertising, promotional material, sales, services, delivery, internal organization, employees and/or operations*;
>
> (i) telephone and facsimile numbers, *web sites*, yellow page advertisements, and *Seller's right to use the name "Mitten Vapors"* and all related names and derivations.

(APA, Dkt. No. 63, at ¶ 1 (emphasis added)).[8]  Exhibit A to the APA confirms that the trustees are selling "all assets" listed on the Mitten Vapors and Ahlan bankruptcy schedules and includes an even more detailed list of property being sold to GRE.  The list identifies small items of personal property, such as label printers, stainless steel racks, bottles, and buckets, as well as other assets like the Mitten Vapors "recipe book" and logos.  (APA, Exh. A.)   Exhibit A also states that the sale includes "[p]asswords, login information and administrative access" to the Mitten Vapors Facebook page, and the website www.mittenvapors.com and its login information.  (*Id.*)

Despite the specificity of the sale documents, neither the APA, Exhibit A, nor the other sale documents refer to the Mitten Vapors email accounts.  The sale documents

---

[8]     The APA also excludes certain assets such as cash, funds in the trustees' fiduciary accounts, security deposits, Ahlan's interest in a vehicle lease, and claims against the bankruptcy estates.  (*Id.*)  None of these exclusions are relevant to the present dispute.

also fail to address the approximately 60,000 email messages that were contained in the mittenvapors.com email accounts.

On April 30, 2019, Winters and Zichterman filed an objection to the Sale Motion. (Dkt. No. 68.)  The objection was based, in part, on the Individuals' assertion that not all of the property listed on Exhibit A to the APA was property of the Mitten Vapors and Ahlan bankruptcy estates, and that it was owned, instead, by them individually.  A hearing on the Sale Motion was held before this court on May 9, 2019.  After a brief recess, during which counsel agreed to a resolution of the Individuals' objection, the court granted the Sale Motion.  An order approving the sale to GRE was entered on May 13, 2019.  (Dkt. No. 71.)  The court's order reflected the agreed upon resolution of the Individuals' objection by excluding certain light fixtures from the sale.

Difficulties with the transfer of the assets ensued almost immediately.  On June 4, 2019, GRE filed a Motion for Contempt against Winters and Zichterman.  (Dkt. No. 73, corrected at Dkt. No. 74.)  The contempt motion alleged, among other things, that the Individuals interfered with GRE's attempts to remove assets from the Mitten Vapors location on Division Avenue in Kentwood.  It also alleged that the Individuals removed other assets from the Division location before GRE arrived to retrieve them.

The present dispute regarding the contents of email messages in Winters' and Zichterman's accounts began with the filing of their Motion for a Protective Order on June 6, 2019.  (Dkt. No. 75, Corrected at Dkt. No. 106.)  The motion acknowledged that GRE had purchased the website www.mittenvapors.com.  It asserted, however, that GRE was requesting turnover of all of the email messages in the accounts used by the Individuals, Jamie@mittenvapors.com and Anthony@mittenvapors.com.  The motion alleged that

10

these email messages included communications with the Individuals' lawyers that were protected by attorney-client privilege or work product doctrine. It also indicated that counsel for the trustees had offered to turn over access to the email accounts after removing all messages to a flash drive for later determination on the issue of privilege. It states that GRE would not agree to this arrangement and demanded "immediate turnover of the emails." (Dkt. No. 75 at ¶ 10.)

GRE filed a response to the Motion for Protective Order (Dkt. No. 78) and a Motion to Enforce the Asset Purchase Agreement (Dkt. No. 79), seeking to compel the trustees to turnover various assets that were subject to the sale, including log-in information for www.mittenvapors.com. The Corporate Debtors also filed a Motion to Set Aside Order Granting Trustees' Motion for Sale of Real and Personal Property, arguing that the sale should be set aside due to mistake or fraud, particularly in light of the clear misunderstanding about the inclusion of the email messages. (Dkt. No. 83.) That motion was later withdrawn (Dkt. No. 115), but the Individuals filed their own Motion to Set Aside the Sale Order which raised similar arguments. (Dkt. No. 96.)

After the filing of the various motions, the court held numerous status conferences in an attempt to narrow the issues, identify the precise email messages that might be subject to the Individuals' claims of ownership and/or privilege, facilitate creation of a privilege log, and expedite turnover of the mittenvapors.com accounts and non-privileged email messages to GRE. The Individuals filed a privilege log on October 31, 2019 (Dkt. No. 121), and the court set this contested matter for an evidentiary hearing.

Prior to the hearing, the Individuals filed a revised privilege log. (Dkt. No. 142.) The parties also filed a Stipulation Regarding Evidentiary Hearing Issues. (Dkt. No. 146.)

In the stipulation, the parties agreed to "limit the analysis of whether the emails were sold to GRE under the Asset Purchase Agreement to those included in the revised privilege log" and agreed that other messages would be turned over to GRE after the evidentiary hearing. GRE also agreed that it would not seek production of any emails relating to personal medical treatment of the Individuals or their families, any emails dated after November 5, 2018 (the date the Individuals filed their chapter 13 cases), or any pre-petition emails between the Individuals and their counsel, Ms. Hulst, or other employees of her law firm. As a result of the parties' stipulation, the dispute has been limited to the 443 email communications set forth on another revised privilege log that was admitted into evidence at the hearing as Individuals' Exhibit 1, plus three additional emails that were included on a supplement after being inadvertently omitted from the log that was admitted during the evidentiary hearing. (Dkt. No. 156.)

The court has conducted an in camera review of the 446 emails that remain at issue.[9] Fourteen of those communications are identified on the privilege log as "attorney

---

[9] The court's review of the email communications revealed at least two instances where the numbers assigned to the documents did not match the Line Item numbers on the privilege log. For example, the emails reviewed by the court included one communication, labelled as Document 427, which was an email to Zichterman from his credit card company and which was designated on the original privilege log as relating to a medical invoice. This message appears to have been deleted from the revised log pursuant to the parties' stipulation but was mistakenly included in the emails submitted to the court. As a result of this error, the emails labelled as Line Items 427 through 443 on the revised log actually correspond to Documents 428 through 444 that were reviewed by the court. To the extent there is a discrepancy in the numbering of a particular communication, this opinion refers to the email by its Line Item number and its Document number.

In its review of the emails, the court also noted a relatively small number of typographical errors on the privilege log. For example, Line Item 20 describes an email from Zichterman to Attorney Fields as being dated April 4, 2016; Document 20 is dated April 5, 2016. Line Item 279 states that it is an email from Zichterman to Attorney Brody, when in fact, Document 279 is a message from Attorney Brody to Zichterman. Unless otherwise noted herein, these errors are immaterial and do not impact the court's privilege analysis.

client" wherein the Individuals consulted with counsel for personal legal advice.[10]   Five

communications on the revised log plus two on the supplement are emails between

Winters and Zichterman for which they claim "personal privilege" or "attorney client and

joint defense privilege" (these messages are referred to herein as the "co-client emails").[11]

One email on the revised log is a message from Zichterman to his tax accountant for

which he claims "personal privilege."[12]   The remaining 424 email communications are

messages between legal counsel and Zichterman and Winters in their capacity as agents

of the corporate entities and as individuals.   The Individuals have asserted that these

communications are subject to both attorney-client and joint defense privilege.


### III.   DISCUSSION.

Unlike most analyses involving attorney-client privilege, which typically arise in a

discovery context, the privilege claims in this case arose as part of an asset sale under

§ 363 of the Bankruptcy Code.   Accordingly, to resolve the dispute, the court must tackle

several issues, including:   (1) whether the email communications are property of the

Corporate Debtors' estates, (2) whether some or all of the messages were conveyed to

GRE by the trustees pursuant to the sale, (3) whether they are subject to claims of

---

[10]      It is clear from of the privilege log and the court's review of the communications that some of these messages sought only personal legal advice. (*See, e.g.*, Line Items 432-438 (Documents 433-439), pertaining to Zichterman's personal bankruptcy filing.)   For others, it is less clear that the advice was only provided to the Individuals personally. (*See, e.g.*, Line Item 439 (Document 440), which is described as containing advice on a potential appeal of the state court contempt judgment.)   However, the distinction is not material in this case.

[11]       *See* Line Items 23, 170, 171, 430 (Document 431) & 440 (Document 441); Supplement 1 & 2.

[12]      *See* Line Item 431 (Document 432).

13

attorney-client privilege, and (4) what effect this claim of privilege may have on the first two questions. This requires the court to revisit the sale that it approved on May 13, 2019, including the Sale Order and the Asset Purchase Agreement.

A. *The Sale*.

Section 363 authorizes chapter 7 trustees to sell property of the estate.[13] 11 U.S.C. § 363(b)(1). Property of the estate is broadly defined to include "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Case law interpreting this provision has consistently emphasized that, while otherwise broad, "§ 541(a)(1) limits estate property to the debtor's interests 'as of the commencement of the case.'" *Cohen v. Chernushin (In re Chernushin)*, 911 F.3d 1265, 1269-70 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 2649 (2019) (quoting *Sender v. Buchanan (In re Hedged-Invs. Assocs., Inc.)*, 84 F.3d 1281, 1285 (10th Cir.1996)). This "'places both temporal and qualitative limitations on the reach of the bankruptcy estate.'" *Id*. "Temporally, 'it establishes a clear-cut date after which the property acquired by the debtor will normally not become property of the bankruptcy estate.'" *Id*. "And qualitatively, 'the phrase establishes the estate's rights as no stronger than they were when actually held by the debtor.'" *Id*. The Sixth Circuit Court of Appeals has consistently recognized this qualitative limitation on the trustee's rights and has held that under § 541, "the trustee succeeds only to the title and rights in property that the debtor had and takes the property subject to the same restrictions that existed at the time the debtor filed the petition." *Demczyk v. Mutual Life Ins. Co. (In re Graham Square, Inc.)*, 126 F.3d 823, 831 (6th Cir.

---

[13] By referencing "personally identifiable information" and placing certain limitations on its transfer, § 363(b)(1) specifically contemplates that some types of information may be sold by the trustee.

14

1997) (citation omitted); *see also Rogan v. Bank One, N.A. (In re Cook)*, 457 F.3d 561, 566 (6th Cir. 2006) (holding, in a strong-arm action under § 544(a)(3), that "the trustee of a bankruptcy estate can have no greater right to the property in question than that held by the debtor prior to bankruptcy").

In this case, the Sale Motion, the Asset Purchase Agreement, and the Sale Order are clear that the assets previously owned by Mitten Vapors and Ahlan Industries were to be sold by the chapter 7 trustees to GRE.  The Mitten Vapors G-Suite account, which had been licensed by the corporate entities for email and related purposes, was among these prepetition assets.[14]  Although the sale documents do not specifically reference G-Suite, the mittenvapors.com email accounts, or their contents, the sale involved "all assets" of the Mitten Vapors and Ahlan bankruptcy estates including "all general intangibles as defined in the UCC"[15] and all records pertaining to the operation of the businesses and their customers, subject to specific exclusions that are not relevant here. Based on these provisions in the sale documents, the court finds that the trustees and GRE intended for the sale to provide GRE access to G-Suite, the business email accounts associated with G-Suite, and to the email messages themselves to the extent they related to the business of Ahlan and Mitten Vapors.  For instance, email communications

---

[14]     There is very little evidence in the record about the G-Suite license.  Statements in emails between counsel for the Corporate Debtors and the Mitten Vapors Trustee suggest that the Corporate Debtors paid for the G-Suite license on a monthly basis prior to the filing of the bankruptcy cases.  The last payment was made in October or November of 2018, around the time the bankruptcy cases were filed.  At some point postpetition, the Trustee re-instated the G-Suite access and began paying the monthly fee.  (*See* GRE's Exhibit A.)  Despite the fact that the Corporate Debtors' access to G-Suite appears to be in the nature of an executory contract, no party has argued that it should be analyzed under 11 U.S.C. § 365.

[15]     The definition of "general intangibles" in Michigan's version of the Uniform Commercial Code specifically includes software.  *See* Mich. Comp. Laws § 440.9102(1)(pp).

15

between an employee and a customer regarding certain products, or emails between employees concerning vape flavors, raw materials or nicotine are related to the businesses.  These messages were sold to GRE.  The parties agree that the bulk of the 60,000 email messages in the G-Suite accounts pertained to the Mitten Vapors business, and therefore fall into this category. Indeed, the trustees have not challenged GRE's assertion that the majority of the emails were part of the sale and, in fact, hired an expert to extract and delete the emails from the G-Suite accounts so that the majority could be transferred to GRE and only those subject to a privacy or privilege claim would be held back pending resolution of this dispute.[16]  Prior to the evidentiary hearing in this matter, the Individuals also agreed that the bulk of the email communications could be transferred to GRE, but without waiving their arguments that the email messages were not sold.

While the business-related email communications, and access thereto, were transferred to GRE, the question is whether the personal communications made through the G-Suite email accounts were also transferred.  That is, if the email communications transmitted through the Mitten Vapors email accounts were personal in nature,[17] or subject to the Individuals' claim of attorney-client privilege, were the Corporate Debtors'

---

[16]     The trustees' Application to Employ IT Specialist was filed on August 21, 2019.  *See* Dkt. No. 107.  At a status conference held before the court on October 18, 2019, counsel for Trustee Gocha advised the court that access to the G-Suite accounts had been provided to GRE.

[17]     The Individuals had previously argued that they had a general expectation of privacy in all of the personal emails that precludes the messages from becoming property of the estate or being sold under the APA.  This argument was largely rendered moot by the parties' pre-hearing stipulation, pursuant to which GRE agreed that it would not seek turnover of many of the emails that contained communications about personal matters but were not otherwise privileged.   As a result, the court need not address the issue of whether the email communications are excluded from property of the estate or otherwise protected from turnover to GRE because the Individuals had a general expectation that they would remain private.  The only possible exception is the email from Zichterman to his tax accountant, which he asserts is protected by a "personal privilege."  That communication is specifically addressed below.

rights in those email communications limited? And, if the Debtors' rights to those messages were limited, was the ability of the trustees to sell those communications similarly constrained? For the communications that remain at issue, the court believes that the answer to these questions turns on whether the emails were restricted by the Individuals' claims of attorney-client privilege and whether they waived any such privilege claims.

B. *Attorney-Client Privilege*.

The privilege claims at issue in this contested matter, which have been asserted in the context of a bankruptcy sale under § 363, are to be analyzed under the federal common law.[18] *See* Fed. R. Evid. 501. "Under federal law, 'a client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client,' between the client and the client's lawyer (or certain representatives of the client and the lawyer)." *In re Asia Global Crossing, Ltd.*, 322 B.R. 247, 255 (Bankr. S.D.N.Y. 2005) (quoting Sup. Ct. Standard 503).[19] The purpose of the attorney-client privilege is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law

---

[18]    Although state law may be relevant to the determination of whether the email communications were property of the estate and therefore subject to the sale, *see Butner v. United States*, 440 U.S. 48, 55, 99 S. Ct. 914 (1979), GRE's demand for access to the contested email messages is based on the Sale Order, which was issued pursuant to federal law. Neither party has argued that this court should apply state privilege law in this matter.

[19]    As explained in *Asia Global*, "Proposed Rule 503, and the other privilege standards, were not adopted as part of the Federal Rules of Evidence" but are considered an "authoritative source" on application of the privilege under federal common law. *Asia Global*, 322 B.R. at 255 n. 6 (citing Hon. Barry Russell, *Bankruptcy Evidence Manual* § 501.2 (2004 ed.)).

and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S. Ct. 677 (1981).

Because the effect of the privilege may be to exclude relevant evidence, thereby standing "in derogation of the search for the truth," it is applied narrowly. *Reed v. Baxter*, 134 F.3d 351, 356 (6th Cir. 1998) (citation omitted), *cert. denied*, 525 U.S. 820 (1998). On the other hand, the attorney-client privilege is guarded "jealously" because "it encourages people to conform their conduct to the law by letting them consult counsel without fear of embarrassment from later disclosure of the communications, back and forth." *In re Carlson*, 2020 WL 1933924, at *2 (Bankr. W.D. Mich. Apr. 21, 2020) (citing *Upjohn*, 449 U.S. at 389).

The Sixth Circuit Court of Appeals has explained that attorney-client privilege applies when the following elements are established:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection is waived.

*Reed v. Baxter*, 134 F.3d at 355-56.  As the parties asserting the privilege, Zichterman and Winters bear the burden of proving that it applies. *United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 1999).

As the Sixth Circuit's definition makes clear, "[t]he attorney-client privilege applies only to confidential communications." *Asia Global*, 322 B.R. at 255 (citing Sup. Ct. Standard 503(b)).  In this context, courts have held that confidentiality has "both a subjective and objective component" and requires that the communication be "given in confidence" and that the client reasonably understood "it to be so given." *Id.* (citations

18

omitted).  A closely related corollary of this confidentiality requirement is the general rule that the "attorney-client privilege is waived by voluntary disclosure of private communications by an individual or corporation to third parties."  *United States v. Dakota*, 197 F.3d at 825 (citing *In re Grand Jury Proceedings October 12, 1995*, 78 F.3d 251, 254 (6th Cir. 1996)).

GRE's main arguments in this contested matter concern the confidential nature of the contested email communications and its allegations that any attorney-client privilege that may have attached to the emails was waived.  If GRE is correct on these points, the court need not engage in a determination of whether the privilege otherwise applies to the emails in question.   Accordingly, the court will begin its privilege analysis by addressing GRE's waiver and confidentiality arguments.

1.   Use of Corporate Email Accounts:  Did the Individuals lack a reasonable expectation of privacy or waive their ability to claim privilege?

GRE's first argument against the Individuals' claims that the contested email communications in this matter are covered by the attorney-client privilege stems from the fact that the messages were sent and received through the Individuals' corporate email accounts.  As a result, GRE argues that the Individuals could not have had a reasonable expectation that the messages would remain private and that the privilege either did not attach to the communications or was waived.

Although email communications differ in some respects from other types of written communication, and may carry additional or different risks of inadvertent disclosure, it is generally accepted that "lawyers and clients may communicate confidential information through unencrypted e-mail with a reasonable expectation of confidentiality and privacy." *In re Asia Global*, 322 B.R. at 256.  Confidentiality and privacy issues may be complicated,

19

however, when the communications at issue occur using a business email account, corporate email system, or work computer.  In such instances, courts have adapted the tests that have traditionally applied to measure an employee's expectation of privacy in the workplace to address privacy expectations with regard to electronic communications. A leading case on the issue, *Asia Global*, sets forth four factors that a court should consider when analyzing an employee's expectation of privacy in the context of email communications:

(1) does the corporation maintain a policy banning personal or other objectionable use,
(2) does the company monitor the use of the employee's computer or e-mail,
(3) do third parties have a right of access to the computer or e-mails,
(4) did the corporation notify the employee, or was the employee aware, of the use and monitoring policies?

*In re Asia Global*, 322 B.R. at 257 (citations omitted).  The court finds *Asia Global* persuasive, has reviewed these factors in this case, and makes the following findings and conclusions.

a.  *Corporate policy regarding email usage*.

The Mitten Vapors Employee Handbook was admitted into evidence at the hearings as Individuals' Exhibit 3.  The Handbook, which is four-pages long, is silent concerning email accounts or email communications.  As a result, the court cannot conclude that Mitten Vapors had any official policy banning, or in any way restricting, personal use of the mittenvapors.com email accounts.  Both Winters and Zichterman testified that they consistently used their Mitten Vapors email accounts for personal matters, and both stated that they expected those communications to remain private and confidential.

With regard to cell phone usage, the Handbook encourages employees to "strive to use" company cell phones for "Company business only."  The testimony presented at the hearing suggested that both Winters and Zichterman used personal cell phones for Mitten Vapors business, although the corporate entities may have occasionally paid their bills.  Even if the Individuals were using company cell phones, the Handbook did not prohibit or restrict personal use of those devices.

### b.   *Company monitoring of computers and emails.*

The Employee Handbook does not specifically address the monitoring of email communications in the mittenvapors.com G-Suite accounts.  Although the Handbook generally permits the company to inspect computers, it is silent as to the ability to inspect particular files, documents, or email communications that may be contained within the computers.  Further, despite the Handbook's reference to potential inspections, both Winters and Zichterman testified that no such computer inspections ever occurred.

### c.   *Third party access to computers and emails.*

At the hearing, both Winters and Zichterman testified that their mittenvapors.com email accounts were password protected.  Zichterman stated that, as the company's G-Suite administrator, he could have accessed other employees' email accounts, but he testified that he had never done so.

### d.   *Employee awareness of company policies.*

Mitten Vapors did not have an official company policy regarding email usage or computer monitoring.  The only policies that were in place were set forth in the Employee Handbook.  Zichterman testified that he was not aware of the Handbook until just before

the evidentiary hearing in this matter.  Winters was aware of the Handbook because he created it.  But again, it did not address email communications specifically.

In analyzing and balancing these four factors, the court finds that the Individuals subjectively expected their personal email communications to remain confidential, even though they were sent and received via the mittenvapors.com email accounts.  The court further finds that this expectation was objectively reasonable, given the company's lack of policies concerning email usage or monitoring, the password protection of the accounts, and the fact that the company had never taken any steps to invade the confidentiality of the accounts.  Similarly, the court finds that the Individuals did not waive their ability to claim attorney-client privilege with regard to the email communications by sending and receiving the messages through the company email accounts.

> 2.  <u>Joint Defense or Joint Client Privilege:  Were the Individuals' privilege claims waived by disclosing the communications to the corporate entities</u>?

Next, GRE argues that because the vast majority of the emails at issue involved legal advice rendered to both the Individuals and the corporate entities, the Individuals' right to assert the attorney-client privilege was waived.  Zichterman and Winters acknowledge that most of the communications addressed the GRE state court litigation, and that this litigation included claims against the corporations and the Individuals personally.  The Individuals assert, however, that these communications are subject to the joint defense privilege.

The joint defense privilege, sometimes referred to as the common interest doctrine or joint client privilege,[20] is "[a]n exception to the general rule that disclosure [of privileged

---

[20]   The case law uses these terms somewhat interchangeably, depending on the circumstances under which they arise.  The joint defense privilege is typically understood to

22

communications] to a third party . . . waives the privilege." *In re Grand Jury Subpoenas, 89-3 and 89-4, John Doe 89-129*, 902 F.2d 244, 248 (4th Cir. 1990).  This exception "is typically understood to apply 'when two or more clients consult or retain an attorney on particular matters of common interest.'" *Cavallaro*, 284 F.3d at 249 (quoting *Weinstein's Federal Evidence* § 503.21[1] (J.M. McLaughlin ed. 2002) (additional citation omitted)). "'With respect to [those] matters of common interest, each joint client may be privy to the other's communications with the attorney without the attorney-client privilege protection being waived by that breach of confidentiality.'" *In re Hotels Nevada, LLC*, 458 B.R. 560, 570 (Bankr. D. Nev. 2011).  When the joint client privilege applies, it may be invoked by any co-client.  *Restatement* at § 75; *see also In re Grand Jury Subpoenas*, 902 F.2d at 248 ("a joint defense privilege cannot be waived without the consent of all parties who share the privilege").

The court finds that because the joint client privilege applies to the 424 emails at issue in this case, the attorney-client privilege was not waived by the sharing of the emails between the Individuals and the corporate entities.  Both Winters and Zichterman testified that their email communications with legal counsel were made in their capacities as

---

protect "communications between an individual and an attorney for another when the communications are part of an ongoing and joint effort to set up a common defense strategy." *In re Grand Jury Subpoena*, 274 F.3d 563, 572 (1st Cir. 2001) (citation and internal quotation marks omitted).  The term "common interest" recognizes the fact that a similar privilege may sometimes "apply outside the context of actual litigation." *Id.* (citing *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989)).  Several authorities set forth a specific rule that applies when "co-clients have communications with the same lawyer." *Restatement (Third) of the Law Governing Lawyers* § 75, cmt. a (2000).

In this case, the evidence established that the lawyers with whom the email communications occurred were retained to represent both the Individuals and the corporate entities.  Accordingly, although the parties and the court have generally referred to the "joint defense" privilege in this matter, the exception that applies is most aptly referred as the "joint client" exception.  The outcome would be the same regardless of what terminology is employed. *See Cavallaro v. United States*, 284 F.3d 236, 250 (1st Cir. 2002).

corporate officers and in their individual capacities.  This is true despite the fact that some of the communications occurred in the approximately three months after GRE filed the state court litigation but before the Individuals were named as defendants.  Even during this time, the corporate entities and the Individuals has a common interest in responding to and defending the state court litigation.  *See* 24 *Fed. Practice & Procedure Evid.* § 5474 (1st ed. 2019) (explaining that Supreme Court Standard 503 reflects the generally accepted view that a person need not be "engaged in litigation" to be considered a "client" for purposes of claiming a privilege).  Zichterman testified that, from the inception of the state court litigation, he fully expected that he would be named as a defendant based upon his communications with his counsel, GRE's counsel, and the agents of GRE.  Winters concurred with this testimony.   The Individuals also testified that their relationships with their legal counsel, including the relevant engagement letters, did not make any meaningful distinctions between the corporations and the Individuals or provide for separate communication with each entity.[21]   The billing also did not distinguish between the different entities; both Winters and Zichterman testified that all of the entities were billed jointly.

Based on the privilege log and the Individuals' testimony, the court finds that the corporate entities and the Individuals were all "clients" for purposes of their communications with legal counsel and were engaged in a common legal effort to defend

---

[21]      Although neither the engagement letters themselves, nor any other written joint defense agreement, was offered as evidence in this matter, those formal documents are not required, particularly when the testimony and other evidence clearly establishes that the corporate entities and the Individuals shared a common interest.  *See Katz v. AT&T Corp.*, 191 F.R.D. 433, 437 (E.D. Pa. 2000) ("the common interest doctrine protects privileged and work-product materials even if there is no 'final' agreement") (citations omitted).

the GRE state court litigation. The joint defense or joint client privilege applies to the emails for which it has been asserted. As a result, the court finds that the sharing of the emails between the Individuals and the corporate entities did not result in a blanket waiver of the attorney-client privilege.[22]

    3. Waiving the Joint Client Privilege: As purchaser of the corporate assets, can GRE waive the privilege?

Even if the joint defense or joint client privilege applies, GRE argues that it can waive the privilege on behalf of the Corporate Debtors because it purchased substantially all of the corporate assets, including ownership and control of the corporate privilege. This argument must be rejected for two reasons.

First, GRE is simply wrong in its assertion that it now holds the corporate attorney-client privilege as a result of the sale. It is true that, upon the filing of the chapter 7 cases, the ability to assert the attorney-client privilege on behalf of the corporate entities passed to their respective chapter 7 trustees. *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 358, 105 S. Ct. 1986 (1985) (when a corporation files for bankruptcy protection, control of the corporate privilege with respect to prebankruptcy communications vests in the chapter 7 trustee). However, it does not necessarily follow that GRE acquired the ability to control the corporate privilege, or became a party to the privilege itself, by virtue of the sale. The primary case cited by GRE for this proposition, actually concludes otherwise. It holds that when "one corporation merely sells its assets to another" the "privilege does not pass to the acquiring corporation unless (1) the asset transfer was also accompanied by a transfer of control of the business and

---

[22] Application of the privilege to specific categories of email communications, including the co-client emails and the email to the accountant, is addressed in greater detail in Part III.B.5 of this opinion.

25

(2) management of the acquiring corporation continues the business of the selling corporation."   *MacKenzie-Childs, LLC v. MacKenzie-Childs*, 262 F.R.D. 241, 248 (W.D.N.Y. 2009).

Neither of these conditions were met here.   This case involved the chapter 7 liquidation of Mitten Vapors and Ahlan and the sale of their assets to GRE.   The debtor entities are no longer in business.   GRE did not acquire the stock of either entity or the interests of the members so that it could control or continue to operate the businesses. GRE did not assume the corporate liabilities.   There is no evidence that GRE's management has continued operation of the debtor entities.   In short, the corporate privilege did not transfer to GRE as part of the sale and continues to be held by the chapter 7 trustees.   The chapter 7 trustees have not explicitly waived the corporate privilege.

Second, even if the chapter 7 trustees or GRE were able to waive the corporate privilege, they could not unilaterally do so with respect to the joint communications with counsel.   As previously stated, and subject to certain exceptions not applicable here,[23] the joint client privilege may not be waived by one co-client on behalf of another. *Restatement* § 75(1) & cmt. e.

4. <u>Waiving the Joint Client Privilege:  Did the Individuals waive the privilege by providing email access to the corporate chapter 7 trustees?</u>

Next, GRE argues that the Individuals disclosed the email communications to the chapter 7 trustees for the corporate entities and, in so doing, waived their right to claim an individual privilege in the emails.   GRE cites *In re Royce Homes, LP*, 449 B.R. 709 (Bankr. S.D. Tex. 2011) in support of this argument.   In *Royce Homes*, the chapter 7

---

[23]    One such exception applies when the co-client who waives the privilege is the one who made the communication.  *Restatement* § 75(1) & cmt. e (explaining that this exception applies "so long as the communication relates only to the communicating and waiving client").

26

trustee gained access to emails sent and received by one of the debtor's key employees by obtaining possession of his assistant's computer data, which included copies of the messages. The court determined that because the employee knew about, but did not object to, the trustee gaining access to contents of the computer, the employee had waived his right to assert attorney-client privilege with regard to the emails. The present matter is distinguishable because, in this case, the Individuals' emails were contained in password-protected accounts within the corporate G-Suite when the chapter 7 cases were filed. The Individuals did not consent to turnover of the emails, or access to the emails, to the trustees. As a factual matter, it is not clear that the trustees and their counsel have ever had access to the emails in the Individuals' accounts. But, even if they did, the court cannot conclude that the Individuals knowingly granted the access in a way the resulted in waiver of the attorney-client privilege.

5. <u>Other Elements of Individuals' Privilege Claim:  Have the Individuals' established that each email is subject to the attorney-client privilege?</u>

In summary, the court finds that the Individuals believed that all of the contested email communications were private and that this belief was reasonable under the circumstances. The court further finds that to the extent a right to claim attorney-client privilege otherwise attached to the emails in question, no blanket waiver of the privilege occurred. Accordingly, the court will turn to the question of whether the other elements of the Individuals' privilege claims have been established.

In a recent decision, *In re Haynes*, 577 B.R. 711 (Bankr. E.D. Tenn. 2017), Judge Bauknight gave a succinct description of how an inquiry into the privileged nature of specific communications should occur. The *Haynes* court explained:

27

> First, . . . the party asserting privilege/protection must do so with particularity for each document, or category of documents, for which privilege/protection is claimed. At this first stage, it is sufficient to meet the initial burden by a properly prepared privilege log. If, after this has been done, the requesting party challenges the sufficiency of the assertion of privilege/protection, the asserting party may no longer rest on the privilege log, but bears the burden of establishing an evidentiary basis—by affidavit, deposition transcript, or other evidence—for each element of each privilege/protection claimed for each document or category of document. A failure to do so warrants a ruling that the documents must be produced because of the failure of the asserting party to meet its burden. If it makes this showing, and the requesting party still contests the assertion of privilege/protection, then the dispute is ready to submit to the court, which, after looking at the evidentiary support offered by the asserting party, can either rule on the merits of the claim or order that the disputed documents be produced for *in camera* inspection.

*In re Haynes*, 577 B.R. at 740 (quoting *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 266-67 (D. Md. 2008)).

In this matter, Zichterman and Winters prepared a privilege log prior to the evidentiary hearing. The log sets forth the bases for their privilege claims for each of the email communications in question. GRE originally objected to the privilege log as not containing sufficient detail. In the face of such an objection, it is appropriate for the parties asserting the privilege to supplement the log with affidavits, deposition transcripts, or other evidence. Here, the privilege log was supplemented with the testimony provided by Zichterman and Winters at the hearing.

The testimony of Zichterman and Winters came very close to establishing the requisite elements of their privilege claim, at least in a broad sense. However, GRE argued that the court could not ascertain the precise topics of each of the emails in question without conducting an *in camera* review of the communications. The court agreed and ordered the Individuals to produce the emails for an *in camera* inspection.

28

The court has completed its review of the email communications.   Having previously determined the blanket waiver and confidentiality elements of the privilege claims, the focus of the court's *in camera* review was whether the emails were communications made for the purpose of seeking legal advice or in relation to that purpose.  *Reed v. Baxter*, 134 F.3d 351, 356 (6th Cir. 1998).  In some instances, the court has also considered whether waiver of the privilege occurred with regard to specific messages.

To begin, although emails are unquestionably "communications" for privilege purposes, defining the scope of the communication can be challenging in the context of email messages which often reply to, forward, or attach prior messages and information. The court notes that the Individuals have erred on the side of specificity and have listed each email message separately on their privilege log, even though many of the messages are part of a broader string of related communications.  They have likewise provided each email message to the court for review as a separate document, although to the extent the messages are replies to or forwards of prior communications, many of the emails also attach the prior messages in the string.  The court has analyzed each separate message to determine whether the claimed privilege applies.  *See N.L.R.B. v. Interbake Foods, LLC*, 637 F.3d 492, 503 (4th Cir. 2011) ("Generally, each e-mail within a particular line of discussion must be analyzed separately for privilege purposes.").

However, because most of the messages are part of broader strings of communications, the court  has also considered the context in which each message was sent when evaluating whether the communications were made for the purpose of, or in

29

relation to, obtaining legal advice.[24] For example, many of the separate emails are correspondence about setting up appointments between the Individuals and their counsel. Viewed in isolation, the legal nature of these messages may not be readily apparent; but in context, it is clear that the predominant purpose of the messages was to schedule meetings at which legal advice would be sought or provided. Such messages are covered by the attorney-client privilege. *See Cooey v. Strickland*, 269 F.R.D. 643, 652 (S.D. Ohio 2010) (attorney-client privilege applies to emails when the "predominant purpose" of the communications "was to schedule meetings or telephone calls and to provide or solicit legal advice").

Having reviewed the email communications in accordance with these standards, the court finds that the overwhelming majority of the communications are accurately depicted on the privilege log as seeking or obtaining legal advice or relating to that purpose. The court also identified several categories of communications that require additional analysis.

> a. *Emails to, from, or copied to attorney's legal assistant.*

Approximately twenty-eight of the email communications provided to the court for review were messages to, from, or copied to Polly S. Campbell at Dickinson Wright.[25]

---

[24] The court believes this approach is particularly appropriate in this case because the email strings are almost exclusively back and forth conversations between the Individuals and their attorneys, in which the same parties were copied on the entire string of communications. *Cf. In re Universal Service Fund Telephone Billing Practices Litigation*, 232 F.R.D. 669, 673 (D. Kan. 2005) (suggesting that when "every separate e-mail within a strand is limited to a distinct and identifiable set of individuals, all of whom are clearly within the attorney-client relationship in which legal advice is being sought or given," it may be appropriate to view the e-mail strand more holistically, including by listing it as one entry on the privilege log).

[25] *See e.g.,* Line Items 13-19, 31, 32, 33, 88, 102, 104, 106, 109, 111, 112, 113, 118, 119, and 145-152.

Ms. Campbell's email signature block lists her title as "Legal Secretary" and, in one of her early emails to Zichterman and Winters, she introduces herself as the legal assistant to Attorney Jeffrey G. York.  (*See* Line Item 13.)

Although the attorney-client privilege traditionally applies to communications to and from lawyers, it is widely recognized that the privilege also extends to communications with a lawyer's assistant or agent.  *See Dabney v. Investment Corp. of America*, 82 F.R.D. 464, 465 (E.D. Pa. 1979) (explaining that "[i]t has long been held that the privilege applies only to members of the bar . . . or their subordinates" and noting that such subordinates may include law students, paralegals, or others acting as the attorney's agent); Sup. Ct. Standard 503, reprinted in *Bankruptcy Evidence Manual* § 501:5 (2010 ed.) (applying attorney-client privilege to communications with a lawyer or the "lawyer's representative").  Accordingly, the emails in question retain their privileged nature despite the fact that many of them were copied to Ms. Campbell.

b.  *The co-client emails.*

As previously noted, five emails on the privilege log and two on the supplement are messages between counsel and Zichterman, which were forwarded by Zichterman to Winters.  Although neither Zichterman nor Winters is an attorney, the fact that these forwarded communications were between non-lawyers "does not per se waive the privilege."  *Crane Security Technologies, Inc. v. Rolling Optics, AB*, 230 F.Supp.3d 10, 21-22 (D. Mass. 2017) (citation omitted).  Several courts have held that the sharing or relaying of legal advice between parties with a common legal interest does not result in a waiver of the attorney-client privilege.  *Id.* at 22 (collecting cases).  An additional exception applies when the non-lawyers are individuals involved in corporate decision-making.

*Graff v. Haverhill North Coke Co.*, 2012 WL 5495514, \*7-8 (S.D. Ohio 2012) (unpublished opinion).   In such instances, documents may be "transmitted between non-attorneys (especially individuals involved in corporate decision-making) so that the corporation may be properly informed of legal advice and act appropriately."   *Id.* at \*8 (quoting *Santrade, Ltd. v. General Elec. Co.*, 150 F.R.D. 539, 545 (E.D.N.C. 1993)).

In this case, it is readily apparent that the legal advice contained in the original emails to Zichterman, which pertained to the Individuals and the corporate entities, was subject to the attorney-client privilege.   It is equally clear that the advice retained its privileged nature when it was forwarded to Winters.   The co-client emails are privileged.

c.   *The accountant email.*

Line Item 431, which was submitted to the court as Document 432, is a forward of an email originally authored by Attorney Timothy Monsma from Zichterman to Ashley Forrest.   The record before the court does not establish Ms. Forrest's relationship to the Individuals, although the privilege log indicates that she was their "tax accountant."   The underlying message from Attorney Monsma to Zichterman is clearly subject to the attorney-client privilege.   However, by forwarding the message to Ms. Forrest, who is not an attorney or co-client and whose role in assisting with the GRE litigation is unclear, the court concludes that Zichterman waived any right to claim attorney-client privilege with regard to this message.

Perhaps recognizing this issue, the Individuals' privilege log claims a general "personal privilege" as to the accountant email, rather than an attorney-client privilege. [26]

---

[26]   The Individuals also have not argued that this communication is protected by accountant-client privilege, likely because such a privilege is not recognized under the federal common law. *See Couch v. United States*, 409 U.S. 322, 335, 93 S. Ct. 611 (1973).

The Individuals do not cite any specific authority for the existence of this "personal privilege," but instead rely on the *Asia Global* factors as establishing a general right to privacy in all of the non-business communications sent and received by the Individuals through their corporate email accounts.  This court rejects the Individuals' argument on this point as overly broad.  Although *Asia Global* cited cases discussing the right to privacy that is recognized under the common law and the Fourth Amendment to the United States Constitution, it did not hold that a blanket right to privacy exists in personal email communications.  *Asia Global*, 322 B.R. at 256-57.  Instead, it utilized these "analogous" authorities as "offer[ing] guidance" on issues of email confidentiality and informing its analysis of whether use of a corporate email system resulted in an overall waiver of the attorney-client privilege.  *Id.*  The record before the court and the forwarded email itself are devoid of any rationale for why the accountant email should be subject to a claim of "personal privilege."  The court, therefore, cannot conclude that the accountant email was protected by a general, personal privilege.

d. *Emails to, from, or forwarded to Winters' personal account*.

Although the vast majority of the emails reviewed by the court were sent to or from the Individuals' corporate accounts, several emails on the privilege log were sent to or from the email address djadubs@gmail.com.[27]  At the hearing, Winters testified that this was his personal email account.  (Tr. at 71-72.)  Accordingly, the fact that email communications were sent, received, or forwarded to this email account is of no consequence to the privilege analysis

---

[27]    *See, e.g.*, Line Items 29, 35, 37, 39, 41, 48, 49, 50, 59, 63, 70, 71, 74, 82, 360, 390, 392 and 393.

e. *Documents attached to email communications.*

Several of the entries on the privilege log refer to documents which may have been sent as attachments to email communications between the Individuals and their legal counsel.[28]  For example, Line Item 189 is a cover email message from Attorney Adam Brody at Varnum Law to Zichterman.  Line Item 190 is a chart, which was presumably attached to the email, and which shows sample questions and answers that might be used in a direct exam of Zichterman.  Although Line Item 190 was an attachment to an email, it nonetheless qualifies as a privileged communication.  For privilege purposes, a "[c]ommunication can be defined as 'any expression through which a privileged person . . . undertakes to convey information to another privileged person and any document or other record revealing such an expression.'"  *Laethem Equipment Co. v. Deere & Co.*, 261 F.R.D. 127, 140 (E.D. Mich. 2009) (quoting *Restatement (Third) of the Law Governing Lawyers* § 69; *Weinstein's Evidence* § 503.14).  Line Item 190, and others like it on the privilege log, are communications that convey legal advice to the Individuals.  As such, they are subject to the Individuals' claims of attorney-client privilege.

f. *Invoices.*

Approximately forty-two of the emails reviewed by the court were transmittals of invoices for legal fees incurred by the Individuals and the corporate entities.[29]  "Typically,

---

[28]     *See, e.g.*, Line Items 171, 190, 191, 221, 222, 229, 230, 232, 233, 395, 396, 397, 399, 401, and the attachments to the three emails listed on the Supplement.

[29]     *See, e.g.*, Line Items 81, 163-169, 192-207, 238-245, 263, 264, 265, 274, 275, 278, 281, 330, 339, and 411.
         Several of these documents are the invoices themselves, and do not include cover letters or emails.  (*See, e.g.*, Line Item 81.)  Others include cover letters but do not specifically indicate that they were sent via email.  (*See, e.g.*, Line Item 263.)  Although it is not clear from the record, the court assumes these documents were included in the privilege log and the documents

34

the attorney-client privilege does not extend to billing records and expense reports." *Chaudhry v. Gallerizzo*, 174 F.3d 394, 402 (4th Cir. 1999), *cert. denied*, 528 U.S. 891 (1999). However, this rule may vary depending on the nature of the information included in the billing records. If the correspondence, time records, or invoices "reveal the motive of the client in seeking representation, litigation strategy, or the specific nature of the services provided" the documents may "fall within the privilege." *Id.* (quoting *Clarke v. American Commerce National Bank*, 974 F.2d 127, 129 (9th Cir. 1992)).

Of the forty-two emails transmitting invoices, all but two contain detailed billing entries that reveal the specific nature of the services provided. The two exceptions are Line Items 163 and 164, which are invoices from Alles Law dated June 30, 2016 and May 31, 2016, respectively. Each of these invoices contain a single entry with only a general description of the work performed. Line Items 163 and 164 are not subject to the attorney-client privilege.

g. *Other non-privileged email.*

Document 400, which is misidentified as Line Item 399 on the privilege log, is a message from Attorney Adam Brody to both Individuals. It is entitled "Jamie revised – I added two questions at the end." The body of the email is entirely blank. Because there is no text, the court would have to speculate as to what this message refers to. The message is not privileged.[30]

---

submitted to the court for review because they were received via email. However, even if they were transmitted by some means other than email, they constitute privileged communications.

[30] The top message in Line Item 357 is similarly blank, but the prior messages in the string are attached and include legal advice. Line Item 357 is privileged.

C. *Effect of Privileged Nature of Email Communications on Their Transfer Under the Sale Order*.

Pre-bankruptcy, although the email communications concerning the GRE litigation included legal advice for both the corporate entities and the Individuals, they were imbued with the Individuals' claims of attorney-client privilege (except as otherwise stated herein). These claims were not waived by the Individuals and could not be unilaterally waived by the corporate entities.   Because the email communications were privileged, the Individuals had the right to refuse to disclose the communications, and to prevent others from disclosing the contents of the emails.   In other words, absent the bankruptcy filing, the corporate entities would not have been able to compel production of the communications, absent the consent of the Individuals.  Similarly, the corporate entities could not have disclosed the emails to a third party.  As explained above, the Sixth Circuit and other courts consistently recognize a qualitative limitation on the trustee's rights such that "the trustee succeeds only to the title and rights in property that the debtor had and takes the property subject to the same restrictions that existed at the time the debtor filed the petition." *Demczyk v. Mutual Life Ins. Co. (In re Graham Square, Inc.)*, 126 F.3d 823, 831 (6th Cir. 1997).  Upon the filing of the corporate chapter 7 cases, the trustees took no greater rights to the emails than the Corporate Debtors themselves held.  Like the Corporate Debtors, the trustees had no authority to disclose these privileged email communications through the sale to GRE.  The trustees have not attempted to do so. The privilege issues here were raised well before the sale of the assets, *see* GRE Exhibit A, and the trustees have taken great care to identify and segregate the disputed communications to ensure a determination was made on the privilege questions before transferring the emails to GRE.

36

Finally, GRE argues that the Individuals waived their ability to claim that the email communications were subject to the privilege claims or not sold because they did not object, either by addressing the emails in their written objection to the Sale Motion or by voicing an objection at the sale hearing.  GRE's argument is unavailing.  The email communications were subject to the Individuals' privilege claims and therefore, the trustees did not have the unfettered right to sell or disclose them.  The sale documents did not specifically reference the mittenvapors.com email accounts, and certainly did not address the privileged messages within those accounts.  The Individuals should not be bound by their failure to object to an issue that was not squarely raised by the Sale Motion.

## IV.    CONCLUSION.

As noted throughout this opinion, the privilege issues in this contested matter are fairly straightforward by themselves but are somewhat complicated by the procedural context in which they have arisen.  The attorney-client privilege, when it applies, provides a basis for refusing to disclose the content of confidential communications; it is not typically concerned with ownership of the communications, the paper on which they are written, or the server where they reside.  Had GRE sought discovery of the email communications at issue here in its nondischargeable debt adversary proceedings against the Individuals, the court would have had little difficulty concluding that the attorney-client privilege applied and provided a basis for the Individuals to refuse to disclose the content of the bulk of the email communications to GRE.  However, having come before the court as the purchaser of the Corporate Debtors' assets, GRE has framed the issue as one of "ownership" of the email communications.  That is a question

37

that the privilege analysis is ill-suited to answer.   Despite this, the parties have reached agreements that have allowed for access to the G-Suite accounts to be given to GRE, for personal emails to be withheld from turnover to GRE, and for the majority of the remaining messages to be provided to GRE.   The issue that remains is whether the 446 emails on the privilege log are subject to the attorney-client privilege, and therefore are protected from disclosure to GRE.  This more closely resembles a traditional privilege question.

The court has endeavored to analyze these difficult issues in a manner that is consistent with the general purposes of the attorney-client privilege and with well-established principles of property of the estate and contract interpretation.  Based on this analysis, the court concludes that the vast majority of the email communications identified on the Individuals' privilege log and supplement were imbued with the claims of attorney-client privilege and remain subject to that privilege.   The trustees took those emails subject to the same restrictions that applied as of the petition date, including the privilege claims.   When the trustees sold the email communications, those privilege restrictions continued to apply.   As a result, the email communications shall not be turned over to GRE.  The only exceptions are the accountant email,[31] the two Alles invoices,[32] and the blank document,[33] which are not subject to a valid privilege claim, were included in the sale to GRE, and shall be turned over.

For the foregoing reasons, the Individuals' Motion for a Protective Order is granted in part and denied in part, in a manner consistent with this opinion.  To the extent it sought

---

[31]    Line Item 431 (Document 432).

[32]    Line Items 163 and 164.

[33]    Line Item 399 (Document 400).

38

a determination concerning the disputed email communications, GRE's Motion to Enforce the Asset Purchase Agreement is also granted in part and denied in part, in a manner consistent with this opinion.  To the extent GRE's motion sought other relief, the court believes it has been withdrawn or resolved by the parties over time.  As a result, the balance of the motion will be denied without prejudice.

The Individuals' Motion to Set Aside the Sale Order was based on the assertion that if the Sale Order included the email accounts and communications therein, inclusion of these assets was a mistake.  As explained above, the corporate email accounts were sold to GRE; however, to the extent the communications within the accounts were imbued with the attorney-client privilege, neither the Corporate Debtors nor the trustees had the ability to transfer them to a third party.  There was no mistake and there is no other basis for setting aside the Sale Order pursuant to Fed. R. Bankr. P. 9024 (incorporating Fed. R. Civ. P. 60(b)).  The motion to set aside the Sale Order will be denied.

Finally, to the extent any of the three motions filed by GRE or the Individuals sought attorney's fees and costs from the opposing party, those requests are denied.

A separate order will be entered accordingly.

**IT IS SO ORDERED.**

Dated July 2, 2020

James W. Boyd
United States Bankruptcy Judge